TUCKER, Judge.
Plaintiff, Hansen Evans Scobee, fifty per cent stockholder of the Scobee and Lewis Corporation, a construction company, sued Arthur Cullen Lewis, the owner of the other fifty per cent of the stock in the aforementioned corporation, for a return to the corporation of Ninety-eight Thousand Five Hundred Eighty-seven and 13/100 ($98,-587.13) Dollars, unlawfully being held by the defendant, and rightfully belonging to the corporation as profits from construction projects, according to plaintiff’s allegations, plus interest at the rate of five per cent (5%) per annum from the date of the completion of each project until paid, or alternatively, from the date of judicial demand; plus attorney fees in the amount of twenty per cent (20%) of all monies collected as a result of this action; plus an additional sum of Four Thousand and no/100 ($4,- *705 000.00) Dollars in accounting expenses incurred or to be incurred by petitioner in having an audit made for Scobee and Lewis.
Plaintiff’s suit was dismissed in the trial court and plaintiff has appealed alleging error by the trial court (1) in not finding that plaintiff had proved by a preponderance of the evidence the existence of a contract between himself and the defendant under which defendant agreed to pay Scobee and Lewis, Inc., ten per cent (10%) of the total job costs of certain jobs performed by Sco-bee and Lewis, Inc., for Arthur C. Lewis, Jr., individually; and also (2) in not holding that under the facts adduced at the trial the burden to Arthur C. Lewis, Jr., to prove by a preponderance of the evidence the existence and validity of any agreement whereby the corporation Scobee and Lewis, Inc., was not to be paid the profits on the work performed by it.
The record reveals that Scobee and Lewis, Inc., was incorporated January 8, 19SS, by the parties to this suit, and their wives who are sisters. The stock was divided equally between the Scobee and Lewis families. Mr. Scobee became the president of the corporation and Mr. Lewis, the vice-president. From the date of incorporation until December, 1956, Mr. Scobee continued to work full-time at Ethyl Corporation as an engineer, meanwhile functioning as a parttime employee of Scobee and Lewis, Inc. In December, 1956, Mr. Scobee resigned his position at the Ethyl Corporation and began to work full-time for Lewis and Scobee, drawing a salary of $10,200.00 per year, which was the same amount he had earned at Ethyl. Mr. Scobee continued to work for Lewis and Scobee at $10,200.00 per annum until the latter part of 1961, when he and Mr. Lewis terminated their business relationship.
The purpose of the formation of the construction company was to perform certain construction work on properties belonging to A. C. Lewis and his affiliate companies, and also to perform construction work for Mr. Scobee and third parties. Scobee and Lewis, Inc., did in fact complete construction projects in the following amounts during the period of its existence:

Approximate Completion:

Oak Manor Hotel Addition _$269,374.38 12/11/58
Laundry Building_ 15,640.08 12/ 7/57
Thom McAn Store_ 56,800.04 1/10/61
Southdowns Shopping Center _ 310,269.52 12/11/61
Bellemont Motor Hotel (1957 Construction only) _ 163,089.63 12/31/57
Deville Apartments ___ 163,563.33 12/31/60
Ten per cent (10%) of each construction project was assessed as overhead cost and included in the figures given above. Mr. Scobee contends that there was an agreement between the two parties here involved to consider ten per cent (10%) additional on the total cost of each project as profits to the corporation, to be included among its assets, and to be divided subsequently among its stockholders. The additional ten per cent (10%), or Ninety-eight Thousand Five Hundred Eighty-seven and 13/100 ($98,587.13) Dollars, has not been received as a part of the assets of Scobee and Lewis, and the plaintiff, Mr. Scobee, called upon Mr. Lewis, on behalf of the stockholders of the corporation to return this amount to the corporation where it can become part of its assets distributable to all stockholders.
The defendant, Mr. Lewis, on the other hand contends that the only agreement which existed between the parties was a simple one made prior to the formation of the corporation in which they agreed to share equally in all profits, all salaries, all commissions, all fringe benefits, etc. Mr. Lewis contends that anything the corporation built for either of them (each completed a residence for himself during the existence of the corporation) would be at corporate cost, and that the party for whom it was built would pay the other personally five per cent (5i%) of the contract price. Mr. Lewis denied that there was ever any such agreement as Mr. Scobee espouses under which ten per cent (10%) of total construction costs would be paid to the corporation, five per cent (5%) then to be *706 paid back to each of the two stockholders, because this would have meant that they would have been taxed twice on the same corporate profits instead of only once. Mr. Lewis alleges further that there was no agreement made between himself and Sco-bee and Lewis, Inc.
Mr. Scobee’s salary was prorated to the various construction projects undertaken by the corporation. At no time did Mr. Lewis draw any salary from the corporation. Alternatively, and in the event that Mr. Lewis should be found indebted to Mr. Scobee, Mr. Lewis contends that it was part of the agreement between the parties that Mr. Scobee’s salary was to be off-set against the profits due him.
The basic issue of this case is the terms of the contract or agreement between the parties to this action. Since the agreement upon which the parties to this suit undertook to do business with each other, using the vehicle of Scobee and Lewis, Inc., was not reduced to writing, and was not witnessed by anyone, we have only the words of the parties themselves to provide the terms of the agreement, and they differ substantially. A careful perusal of the entire record of this case fails to reveal any evidence to substantiate plaintiff’s contentions that ten per cent (10%) of the total job costs were to be placed in the corporate assets prior to distribution to the stockholders.
On the other hand there is evidence which corroborates the allegations of the defendant Lewis. Alex Postlethwaite, a certified public accountant whose firm prepared the tax returns for Scobee and Lewis from the time of its incorporation, testified that an examination of the books of the corporation did not reveal any indication that the corporation was to receive ten per cent (10%) of the construction costs from either of the major stockholders, parties to this suit, even of those jobs performed for the stockholder personally, nor was he informed of any such agreement. Mr. Postlethwaite testified further as an expert witness that he knew of no requirement by the federal government that a corporation make a profit for its shareholders.
David M. Evans, another certified public accountant with the firm of Postlethwaite & Lee, personally familiar with the books of Scobee and Lewis throughout its existence, testified that he had not been informed by Mr. Scobee as president of Sco-bee and Lewis, and had not learned from the corporation books or from any other source of anything to indicate any such agreement as that alleged by Mr. Scobee.
Mrs. Geraldine Crosby Day, who was the bookkeeper and secretary for Scobee and Lewis throughout its existence and completely familiar with its business affairs and financial matters, testified that she knew of no such agreement between the parties herein or between defendant-appel-lee and Scobee and Lewis whereby he would pay Scobee and Lewis, Inc., ten per cent (10%) of the total construction costs. She testified positively that she did know of an agreement between parties to this suit:
“ . . . And it was my understanding it was strictly a partnership deal, that anything that Mr. Scobee built for Mr. Lewis there would be a five per cent profit due on this, and vice versa.
Q. Was to be due the corporation or due to Mr. Scobee?
A. It was to be due to Mr. Scobee, not run through the corporation.
Q. Did Mr. Scobee ever advise you to the contrary?
A. He did not.”
Mrs. Day testified further that she had discussed this agreement with Scobee many times and explained the books to him, which were open to him at all times. On cross-examination Mrs. Day reiterated her earlier contentions as follows:
“A. At the time it was formed, at the time Mr. Lewis considered bringing Mr. Scobee in; he surely did talk to me about it.
*707 Q. I see. This is back when the corporation first began, Mrs. Day?
A. That’s true.
Q. And what did you understand the agreement to be at that time now?
A. I understood that it was a partnership agreement; they felt that they could make a profit together. It would be advantageous to both of them, and as reiterated before, we had been doing building for our own account; to be done in the same manner. Mr. Scobee would assist; Mr. Lewis would be on the job as well; five per cent would be due on anything built for Mr. Lewis to Mr. Sco-bee; five per cent would be due to Mr. Lewis on anything that Mr. Sco-bee brought in. And it was my understanding that Mr. Scobee would bring in quite a number of contracts, which never materialized.” (Tr. 195)
* i|s % >}{ ^
“Q. And was that, was the agreement that you’re referring to about how this matter was to be handled, was this while Mr. Scobee was still at Ethyl Corporation?
A. Yes, uh huh, of course.
Q. I see. Well now did you ever have any subsequent discussions with Mr. Lewis about it?
A. Well I would, we talked about it at different times. Mr. Lewis told me once and for all in the beginning how it was to be handled, and we never entered into it again.
Q. It didn’t make any, it didn’t change anything at all when Mr. Scobee resigned his position at Ethyl Corporation and went full time for Scobee and Lewis ?
A. Not at all, because it was felt that this would be a very pleasant and profitable relationship.
‘‘Q. Actually then Mr. Scobee’s position as to what his interest was in the company and what consideration he was to receive was actually the same from the very beginning and didn’t change at all when he left Ethyl Corporation, is that right?
A. That’s correct.
Q. And so the, it never changed at all with, did you have a discussion with Mr. Scobee of why he would want to leave Ethyl Corporation and give up his income at Ethyl Corporation and still have exactly the same business relation in existence between he and Mr. Lewis through Scobee and Lewis ?
A. Well as I said before, I think Mr. Scobee was of the opinion that he could secure additional .contracts in addition to work we did for ourselves which he did quite a lot of work attempting to secure these contracts, but none of them materialized.
Q. When did you have that discussion with Mr. Scobee, I’m saying?
A. Various times; we were friends, Mr. Hunter.
Q. But did you discuss with Mr. Sco-bee, yourself, why he, Mr. Scobee, would resign his position at Ethyl Corporation ?
A. Well frankly it was family matter and I didn’t consider it any of my business. No. I did not.” (Tr. 197)
The appellant himself admitted that the corporate books did not reflect any such agreement as he alleges.
Even though appellant admitted that he know that the corporate books revealed that appellee had paid nothing to the corporation in accordance with the supposed agreement, he made no demand for payment until after the corporation had ceased do *708 ing business. Basil Lee, a certified public accountant, who prepared an audit of Sco-bee and Lewis based upon information supplied him by appellant did not include any indication that ten per cent (10%) of the total construction costs were to be included as a corporate asset.
In view of all the countervailing evidence set forth above we cannot conclude that plaintiff-appellant proved his case by a preponderance of the evidence that a ten per cent (10%) corporate “override” on the construction costs of Scobee and Lewis had been agreed upon by the parties herein prior to the formation of the corporation.
Although plaintiff sued as a representative of the stockholders of Scobee and Lewis for a return to the corporation of alleged corporate profits, we feel compelled to note that, by plaintiff’s own statements as set forth above, any agreement regarding the subject matter of this suit was made prior to the formation of the corporation and cannot be considered a corporation contract. Nor are there any corporate Minutes to substantiate any such agreement. Whatever the understanding between the parties herein, it was necessarily a contract between individuals, upon which no corporation and/or stockholders’ suit can now be heard. Furthermore the written contracts with the appellee for construction of the appellee’s projects, which are not the contracts being sued upon herein, did not include any such ten per cent (10%) profit as alleged by appellant.
Defendant filed a plea of prescription of ten years on the ground that the suit was filed on August 4, 1965, more than ten years after the alleged agreement was confected by the parties. The trial court did not pass upon the plea of prescription, and we do not believe the record established that prescription had tolled on the claim. Claims under a contract prescribe ten years from the date they arise rather than from the date of the contract.
For the foregoing reasons the judgment of the trial court will be affirmed at appellant’s costs.
Affirmed.